**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*


KATHLEEN CLAUDY,                                    *

     Plaintiff,                                   *

v.                                                                 **Case No.: GJH-18-517**

                                                  *

USAA LIFE INSURANCE COMPANY,         *

     Defendant.                                   *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

This case involves a dispute concerning benefits under a life insurance policy (the "Policy") issued by Defendant USAA Life Insurance Company insuring the life of Paul Martin for $1,000,000. ECF No. 2; *see* ECF No. 43-4. Upon Mr. Martin's death, Defendant rescinded the Policy based on alleged misrepresentations that Mr. Martin made about his health during the application process, and it declined to pay benefits to the Paul Martin Testamentary Trust (the "Trust"), the primary beneficiary of the Policy. ECF Nos. 43-4, 43-19. Plaintiff Kathleen Claudy, Mr. Martin's sister, subsequently brought this breach of contract action on behalf of the Trust. ECF No. 2. Pending before the Court are the parties' cross-motions for summary judgment. ECF Nos. 43, 44. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Cross-Motion for Summary Judgment is denied.

## I.  BACKGROUND

### A.  Application

Mr. Martin applied for the Policy in January 2015 (the "Application"), when he was thirty-eight years old. ECF No. 43-4 at 5; ECF No. 43-5 at 22.[1] He applied online, signing each part of the Application electronically and consenting to electronic delivery of future documents. *See* ECF No. 43-5. The Application contained two parts. The first part requested basic biographical and administrative information regarding Mr. Martin and the proposed beneficiaries. ECF No. 43-5 at 11–25. Immediately above the signature block for this part of the Application, it stated:

> I have read the questions and answers in this application. I represent that all statements and answers provided in this application and as part of the application process are true, complete and correctly recorded to the best of my knowledge and belief and will be relied upon by USAA Life Insurance Company to form the basis of any policy which may be issued. I agree that a copy of this application, if approved, will be a part of any policy issued. I understand I may not receive an illustration until the policy is issued.

*Id.* at 15.

The second part of the Application involved completion of the "Examiner's Report." *Id.* at 2–9. The Examiner's Report first required Mr. Martin to complete a questionnaire regarding his medical history. ECF No. 43-5 at 2–5, 7–8.

The relevant evidence concerning Mr. Martin's medical history shows that he had several visits with medical providers between 2008 and 2015. On April 4, 2008, Mr. Martin had an appointment with Dr. Timothy D. Muir, M.D. *See* ECF No. 43-14. Mr. Martin's chief complaint was high blood pressure, and he reported to Dr. Muir that he consumed two to three alcoholic

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

beverages per day, with a higher intake on weekends, which Dr. Muir's notes characterized as a decreased alcohol intake. *Id.* at 2; ECF No. 43-13 at 19. Mr. Martin also reported that he "ha[d] been feeling fine," but he was not exercising and his diet was "not great." ECF No. 43-14 at 2; ECF No. 43-13 at 19. Dr. Muir diagnosed Mr. Martin with "hypertension essential," and the treatment plan included an instruction to "d/c" alcohol.[2] ECF No. 43-14 at 3.

Mr. Martin saw Dr. Muir again on June 25, 2010 for a physical examination. ECF No. 43-9. He reported anxiety and weight issues and that he had been "drinking 2 pitchers beer/nig[h]t to manage anxiety and then to sleep" and that he was interested in quitting. *Id.* at 2. Dr. Muir's notes indicate that Mr. Martin did not have "[withdrawal symptoms] whe[n] he does not drink, and he actually feels better then," and that "he feels bad the day after [drinking] and this has kept him from exercising regularly." *Id.* The resulting treatment plan involved "see[ing] a therapist re: anxiety, with a goal of d/c [alcohol], at which point he will be able to effectively resume exercise and lose w[eigh]t." *Id.* at 6. According to Dr. Muir, this was "at the heart of his overall medical status." *Id.* Dr. Muir also ordered an electrocardiogram, *see id.* at 7–8, which he later characterized as "normal," ECF No. 43-13 at 7, and various blood tests, including for lipids and liver function, ECF No. 43-9 at 9–10. After the appointment, on June 30, 2010, Dr. Muir wrote Mr. Martin a prescription for a liver ultrasound that he recommended because Mr. Martin's liver enzymes were elevated. ECF No. 43-12; ECF No. 43-13 at 32. There is no evidence that Mr. Martin ever completed the liver ultrasound.

Mr. Martin also received treatment from Mr. Paul Thorn, PA-C, under the supervision of Dr. Rajshree Thaker, M.D., for hypertension and anxiety in June 2014. ECF No. 43-10; ECF No. 44-5. On June 20, 2014, Mr. Martin told Mr. Thorn that he had suffered from anxiety for most of

---

[2] Dr. Muir's notes state "d/c etoh." ECF No. 43-13 at 3. It is undisputed that "etoh" means alcohol. ECF No. 11 at 10.

his life, but it had been getting worse over the past year. *Id.* at 6. He reported that he "used to drink regularly to deal with stress, but he stopped drinking three weeks ago because he realized what he was doing and that he was drinking too much (6–9 beers daily)." *Id.* At the appointment, Mr. Thorn ordered a basic metabolic panel, complete blood count, hepatic function panel, lipid panel, thyroid stimulating hormone test, and urinalysis. *Id.* at 5; ECF No. 43-16 at 13. He recorded in his notes that Mr. Martin had "[p]robable long term anxiety that [he] ha[d] been self-treating with alcohol," and he prescribed Zoloft and Xanax as part of a treatment plan for anxiety. ECF No. 43-10 at 6. Mr. Martin saw Mr. Thorn again on June 27, 2010 to discuss blood pressure and stress. *Id.* at 2–5. Mr. Thorn advised Mr. Martin to "continue to abstain from alcohol" as part of a treatment plan for benign hypertension, and to use Xanax "to deal with impending vacation with in[-]laws" as part of a treatment plan for anxiety. *Id.* at 2. Mr. Thorn's notes indicate that Mr. Martin was "[a]t risk for relapsing alcohol if he does not have more medicine." *Id.* at 3. Finally, Mr. Martin had an appointment with Dr. Thaker on August 11, 2014. ECF No. 43-11. Her notes indicate that he had previously had an abnormal liver function study, that a hepatic function panel was to be performed the day of the appointment, and that Mr. Martin was "encouraged to decrease alcohol intake." *Id.* at 2.

     Despite this medical history, Mr. Martin provided the following responses to relevant questions in the Examiner's Report:

- Question 5.d. asked, "Has any Insured ever consulted with a health care provider for … disorder of the … liver?" Mr. Martin responded "No." ECF No. 43-5 at 4.

- Question 8.a. asked, "Has any Insured, within the past five years … had an electrocardiogram, X-ray or any other diagnostic test or procedure that was not previously disclosed?" *Id.* Question 8.b. asked, "Has any Insured, within the past

five years … been advised to have any diagnostic test, hospitalization or surgery which was not completed?" *Id.* Mr. Martin responded "No" to both questions. *Id.*

- Question 11 asked, "Has any Insured been diagnosed or treated for alcohol or drug abuse or been advised by a health care professional to discontinue the use of alcohol or to seek treatment for drug or alcohol dependency?" *Id.* Mr. Martin responded "No."

- Question 12 asked, "Has any Insured consulted a health care provider for any reason not previously disclosed?" *Id.* Mr. Martin responded "Yes," *id.*, and then disclosed, among other consultations, the following:

> What was the reason? **Complete physical**
> What was the condition? **Normal**
> Enter the name and contact information for the healthcare provider or facility that has the most recent records for this condition.
> **TIMOTHY DAVID MUIR MD, 1715 N George Mason Dr, Suite 307 Arlington, VA 2205 Phone: 7032430040, / Fax: 7032436170**

Completion of the Examiner's Report also required Mr. Martin to submit to a physical examination, whereby an agent of Defendant recorded Mr. Martin's vitals and conducted basic lab work, including an electrocardiogram and blood test. *Id.* at 6; ECF Nos. 43-7, 43-8; *see also* ECF No. 43-20 at 16. Immediately above the signature block for the Examiner's Report, the Application states:

> I have read the above statements and answers and represent that they are true and complete and correctly recorded. I agree that such statements and answers shall be part of the application and are made with the expectation that USAA LIFE INSURANCE COMPANY will consider the information when determining whether to issue the policy or contract for which I have applied.

ECF No. 43-5 at 5.

Based upon the information in the Application, Defendant issued the Policy to Mr. Martin on February 15, 2015. ECF No. 43-4 at 5. It contained an "Incontestability Provision," which provided that for two years from the effective date, Defendant "may rescind the policy or deny a claim on the basis of a material misstatement in the application." ECF No. 43-4 at 12. It also stated that the Policy and the Application constituted the entire contract between Mr. Martin and Defendant. *Id.*

### B. Rescission

Mr. Martin passed away on January 30, 2016 as a result of mixed drug intoxication and hypertensive arteriosclerotic cardiovascular disease. ECF No. 43-17 at 3–4. At the time of his death, the primary beneficiary of the Policy was the Trust and the contingent beneficiary was Plaintiff in her personal capacity. ECF No. 43-4 at 42.

On May 18, 2016, Plaintiff, as trustee, submitted the Trust's claim for the Policy benefits. ECF No. 43-18. Following an investigation, Defendant denied the claim and rescinded the Policy. ECF No. 43-19. In a letter to Plaintiff (the "Denial Letter"), Defendant explained that it had "determined that material misstatements and omissions in Mr. Martin's application would have affected [Defendant]'s decision to accept the associated risk and issue the policy," *id.* at 2, and that "[i]f Mr. Martin's health information had been fully and accurately disclosed, [Defendant] would have declined Mr. Martin's application for life insurance," *id.* at 3.

The Denial Letter identified two specific "misstatements and omissions [that] would have been material to [Defendant]'s underwriting decision with respect to the Policy." *Id.* at 2. First, the Denial Letter identified Mr. Martin's response to Question 11 concerning alcohol. ECF No. 43-19 at 2; *see* ECF No. 43-5 at 4. The Denial Letter stated that Mr. Martin responded "No" to this question even though medical records indicated that Mr. Martin had consumed alcohol daily

in order to manage anxiety and stress, had been referred by a medical provider to see a therapist with the goal of decreasing alcohol consumption, had been advised to abstain from consuming alcohol as part of the treatment for hypertension, and had been advised to decrease his alcohol intake in order to address an abnormal liver function study. ECF No. 43-19 at 2.

The Denial Letter also identified Mr. Martin's response to Question 12, which concerned other consultations not previously disclosed, as a material misrepresentation. ECF No. 43-19. The Denial Letter indicated that Mr. Martin responded "Yes," and disclosed, among other consultations, the following: "Complete Physical, Normal, Dr. Timothy David Muir, Arlington, VA." *Id.* The Denial Letter then stated:

> In making these disclosures, Mr. Martin omitted or misrepresented consultations with Dr. Muir at Potomac Physician Associates. Mr. Martin represented the condition that triggered consultation with Dr. Muir as a complete physical and his condition as "normal." Dr. Muir's records show that Mr. Martin was experiencing anxiety, weight gain, and concerned about excessive alcohol consumption.

ECF No. 43-19 at 3. The Denial Letter closed by stating that "[o]nce rescinded, the policy will be considered void, as if it had never been issued." *Id.* Defendant refunded the premiums paid for the Policy in the amount of $859.73, but it did not pay any life insurance benefits. *Id.*

### C. Procedural Background

On January 8, 2018, Plaintiff filed a Complaint alleging breach of contract in the Circuit Court for Montgomery County, Maryland based on Defendant's failure to pay the life insurance benefits under the Policy. ECF No. 2. Defendant removed the case to this Court on February 21, 2018. ECF No 1. Defendant filed a Motion for Summary Judgment on April 15, 2019, ECF No. 43, and Plaintiff filed a Cross-Motion for Summary Judgment on April 26, 2019, ECF No. 44. Defendant filed a response on May 10, 2019, ECF No. 45, and Plaintiff filed a response on May 24, 2019, ECF No. 46.

## II. STANDARD OF REVIEW

Summary judgment is properly granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 806 (4th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). Courts view the record as a whole and in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). While the movant bears the burden of demonstrating the absence of a genuine issue of material fact, it is the non-moving party's burden to establish the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)). "The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its 'affirmative obligation … to prevent factually unsupported claims or defenses from proceeding to trial.'" *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 407 (D. Md. 2015) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)). When considering a motion for summary judgment, the judge's function is not "to weigh the evidence and determine the trust of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249.

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

"The court must deny both motions if it finds there is a genuine issue of material fact, '[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.'" *Wallace v. Poulos*, Case No. DKC–08–0251, 2009 WL 3216622, at *4 (D. Md. Sept. 29, 2009) (citation omitted).

## III.    DISCUSSION

The parties have filed cross-motions for summary judgment. Plaintiff seeks summary judgment on her breach of contract claim, which requires her to establish (1) a valid contractual obligation and (2) the other party's breach of that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). Plaintiff contends that she is entitled to summary judgment because Defendant had an obligation to pay life insurance benefits under the Policy and it has not done so.

Under Maryland law, however, "a material misrepresentation on an insurance policy application justifies the rescission of a policy issued on the basis of that application." *Certain Underwriters at Lloyd's v. Cohen*, 785 F.3d 886, 890 (4th Cir. 2015); *see also* MD. CODE ANN., INS. § 12-207. Thus, Defendant contends that it is entitled to summary judgment because it rescinded the Policy based on material misrepresentations Mr. Martin made in completing the Application and there was therefore no valid contractual obligation. Specifically, Defendant contends that Mr. Martin made material misrepresentations regarding advice and treatment he received related to alcohol; consultations he did for liver disorder; his physical examination by Dr. Muir; the performance of an electrocardiogram, hepatic function panel, and lipid panel; and the existence of a liver ultrasound prescription.

The parties do not dispute that there was a Policy and that Defendant has not paid life insurance benefits. Rather, the primary issue presented by the pending motions is whether

Defendant had a valid basis to rescind the Policy. Thus, the Court must determine whether there is a genuine issue of fact as to whether Mr. Martin made material misrepresentations.

### A. Scope of Permissible Bases for Rescission

Before addressing whether either party is entitled to summary judgment, the Court must resolve a threshold legal dispute between the parties. In its Motion for Summary Judgment, Defendant asserts several material misrepresentations that it did not include in the Denial Letter. ECF No. 43-1 at 16. Plaintiff contends that Defendant has waived any misrepresentations not raised in the Denial Letter and therefore is only entitled to assert material misrepresentations related to alcohol and Mr. Martin's physical examination by Dr. Muir. ECF No. 44-1 at 12–14. Plaintiff is incorrect.

"The doctrine of waiver may work to deprive an insurer of a right it would otherwise possess." *Creveling v. Gov't Emps. Ins. Co.*, 376 Md. 72, 96 (2003). It cannot, however, "operate to expand or establish insurance coverage." *Humane Soc. of the U.S. v. Nat'l Union Fire Ins. Co.*, Case No. DKC–13–1822, 2015 WL 4616818, at *5 (D. Md. July 30, 2015). Thus, under Maryland law, there is "a distinction between defenses founded upon lack of basic coverage and those arising from the failure of the claimant to satisfy some technical condition subsequent. The former, it is apparent, may not be waived merely by the company's failure to specify them in its initial response to the claim, for the effect of that would be to expand the policy to create a risk not intended to be undertaken by the company." *Id.* (quoting *Ins. Co. of N. Am. v. Coffman*, 52 Md. App. 732, 742–43 (Md. Ct. Spec. App. 1982)) (internal quotation marks omitted). "To determine whether the doctrine of waiver may apply, the pivotal issue is whether a policy clause or condition proffered as a defense pertains to coverage or whether it arises from 'the failure of the claimant to satisfy some technical condition subsequent.'" *Id.* at *6 (quoting *Gov't Emps. Ins.*

*Co. v. Grp. Hospitalization Med. Servs., Inc.*, 322 Md. 645, 651 (1991)). "Conditions going to the coverage or scope of a policy as distinguished from those furnishing a ground for forfeiture may not be waived by implication from conduct or action." *Id.*

Here, the defense of misrepresentation does not "arise[] from 'the failure of the claimant to satisfy some technical condition subsequent.'" *See Human Soc.*, 2015 WL 4616818, at *5. Rather, Mr. Martin's alleged misrepresentations pertain to the Policy's coverage. To find that Defendant waived assertion of any particular misrepresentation would "expand the policy to create a risk not intended to be undertaken by the company" because it would require Defendant to cover unknown risks related to the medical history that Mr. Martin failed to disclose and the medical information Defendant would have gathered had it known the truth. *See id.* at *5 (finding that insurer did not waive defenses related to coverage by failing to raise every defense in the initial letter responding to a claim). Defendant is therefore permitted to assert material misrepresentations in addition to those asserted in the Denial Letter.[3]

## B. Material Misrepresentations

The Court must now determine whether the evidence regarding Mr. Martin's alleged misrepresentations entitle either party to summary judgment or whether it creates a genuine issue of fact. The Maryland Insurance Code provides that, with regard to "[s]tatements in applications for life … insurance":

---

[3] Plaintiff's primary opposition to the scope of Defendant's misrepresentation defense is that Defendant's corporate designee stated during her deposition that the Denial Letter contained all of the bases for rescission and that Defendant failed to produce any underwriting guidelines regarding the misrepresentations not in the Denial Letter. This argument is unpersuasive. The effect of finding that a fact witness's deposition testimony or a party's response to a production request can waive a defense would be to improperly expand the insurance policy based on that testimony or production response. *See Emcor Grp., Inc. v. Great Am. Ins. Co.*, Case No. ELH–12–142, 2013 WL 1315029, at *29 (D. Md. Mar. 27, 2013). To the extent that Plaintiff claims Defendant committed discovery violations, those concerns are better addressed through a motion under Federal Rule of Procedure 26 and are not grounds for granting or denying a summary judgment motion.

A misrepresentation, omission, concealment of facts, or incorrect statement does not prevent a recovery under the policy or contract unless:

> (1) the misrepresentation, omission, concealment, or statement is fraudulent or material to the acceptance of the risk or to the hazard that the insurer assumes; or
>
> (2) if the correct facts had been made known to the insurer, as required by the application for the policy or contract or otherwise, the insurer in good faith would not have:
>
>> (i) issued … the policy or contract;
>>
>> (ii) issued the policy … at the same premium or rate….

MD. CODE ANN., INS. § 12-207(b).

A court must engage in a two-step inquiry to determine whether the insurer has validly rescinded an insurance policy based on misrepresentations in the application. *See Colony Ins. Co v. R & P Auto., LLC*, Case No. BPG–27–727, 2018 WL 6018787, at *4 (D. Md. Nov. 16, 2018) (citing *Fitzgerald v. Franklin Life Ins. Co.*, 465 F. Supp. 527, 534 (D. Md. 1979)). First, the court must determine whether the policyholder made a false statement on the application. *See Cohen*, 785 F. 3d at 890. "[T]he insurer may avoid the policy regardless of whether the material misrepresentation is made intentionally, or through mistake and in good faith." *Gary v. USAA Life Ins. Co.*, 229 F. Supp. 3d 365, 376 (D. Md. 2017) (quoting *Fitzgerald*, 465 F. Supp. at 534) (internal punctuation omitted).[4] "In determining whether a misrepresentation occurred, the court

---

[4] Plaintiff contends that Maryland law does not contain an objective standard for determining whether a policyholder made a misrepresentation and thus Mr. Martin only made a misrepresentation on the Application if he subjectively believed his representation to be false. In support of her argument, Plaintiff cites the most recent version of the Maryland code that, according to Plaintiff, removed the objective standard for material misrepresentations, cites to cases from other jurisdictions, and refers to an acknowledgement in the Application stating that the answers in the Application were true to the "best of [Mr. Martin's] knowledge and belief." *See* ECF No. 44-1 at 14–17. Plaintiff's argument is unpersuasive. First, Plaintiff's interpretation of the Maryland statute and case law is incorrect. A policyholder's "subjective belief" in the truth of his statements "would not excuse" his misrepresentations. *See Colony Ins. Co.*, 2018 WL 6018787, at *6. Despite any changes to the Maryland statute, courts analyzing the statute have continued to employ an objective standard for determining whether an applicant made a misrepresentation. *See, e.g.*, *Gary*, 229 F. Supp. 2d at 376 (interpreting the 2017 version of the statute and stating, "[p]ursuant to the statute, '[t]he insurer may avoid the policy regardless of whether the material misrepresentation is made intentionally, or through mistake and in good faith.'"). Additionally, the acknowledgement above the signature block in the Examiner's Report, which contains the only alleged misrepresentations in this case, specifically states that the

'may consider whether the question directed to the insured was reasonably designed to elicit information material to the risk.'" *Colony Ins. Co.*, 2018 WL 6018787, at *4; *see also Cohen*, 785 F.3d at 892.

If the policyholder did make a false statement, "a court then considers whether the false statement was material to the risk assumed by the insurer." *Cohen*, 785 F.3d at 890. "The materiality inquiry focuses on what the insurer's use of the undisclosed information would have been in determining the life risk of the insured at the time of application for the policy." *Gary*, 229 F. Supp. 3d at 380 (quoting *Holsey v. Ohio State Life Ins. Co.*, 39 F.3d 1177 (Table), 1994 WL 592750, at *3 (4th Cir. 1994)) (internal punctuation omitted). The misrepresentation is material if the insurer cannot "appreciate the scope" of the risk it is asked to insure. *Colony Ins. Co.*, 2018 WL 6018787, at *7. "'Ordinarily and generally, whether a representation is true or false, or material to the risk, is for the jury to determine,' but when the insurer demonstrates falsity and materiality 'by uncontradicted or clear and convincing evidence[,] the question may be one of law.'" *Cohen*, 785 F.3d at 890 (quoting *Monumental Life Ins. Co. v. Taylor*, 212 Md. 202, 210 (1957)).

After reviewing the evidence in the record, the Court concludes that "clear and convincing evidence" establishes that Mr. Martin made material misrepresentations regarding advice he received to discontinue alcohol use and the existence of a prescription for a liver ultrasound, but that there are genuine issues of material fact regarding the existence or materiality of the remaining asserted misrepresentations. However, because the existence of even one material misrepresentation justifies rescission of the Policy, Defendant is entitled to

---

statements in that section "are true and complete and correctly recorded." ECF No. 43-5 at 5. It therefore contains none of the language that Plaintiff contends creates a subjective standard for evaluating misrepresentations.

summary judgment on Plaintiff's breach of contract claim. The Court will discuss each alleged material misrepresentation in turn.

### a. Advice and Treatment Related to Alcohol

Mr. Martin's response to Question 11 on the Application provides the first basis for granting summary judgment to Defendant. Question 11 asked, "Has any Insured been diagnosed or treated for alcohol or drug abuse or been advised by a health care professional to discontinue the use of alcohol or to seek treatment for drug or alcohol dependency?" ECF No. 43-5 at 4. Mr. Martin responded "No." *Id.* Defendant contends that this response was a misrepresentation because multiple medical providers advised him to discontinue alcohol use and treated him for alcohol abuse. In opposition, Plaintiff contends that Mr. Martin never received a diagnosis of alcoholism, so he was therefore never treated or advised to discontinue alcohol use in connection with any such diagnosis.

As an initial matter, the parties disagree on the appropriate interpretation of Question 11, which is a question of law for the Court. *See Sky Angel U.S., LLC v. Discovery Comms., LLC*, 885 F.3d 271, 278 (4th Cir. 2018). Policy terms are given "their ordinary and accepted meanings," and "[t]he test is what meaning a reasonably prudent layperson would attach to the term." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985). "Maryland does not follow the rule of many other states that insurance policies are generally construed against the insurance company. Nevertheless, 'any ambiguity will be construed liberally in favor of the insured and against the insurer as *drafter of the instrument*.'" *White Pine Ins. Co. v. Taylor*, 233 Md. App. 479, 499–500 (Md. Ct. Spec. App. 2017) (quoting *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015)). Policy language is "ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson." *Pac. Indem. Co.*, 302 Md. at 389. A court

should not, however, engage in a "strained or unreasonable" reading simply to create ambiguity. *See DeJarnette v. Fed. Kemper Ins. Co.*, 299 Md. 708, 721 (1984); *see also Catalina Enters., Inc. Pension Trust v. Hartford Fire Ins. Co.*, 67 F.3d 63, 66 (4th Cir. 1994).

Plaintiff contends that Question 11 is appropriately read as a two-part question:

(1) "Has any Insured been diagnosed or treated for alcohol or drug abuse?"; and

(2) "Has any Insured been advised by a health care professional to discontinue the use of drugs or alcohol or to seek treatment for drug or alcohol dependency?"

ECF No. 46 at 5. Under Plaintiff's interpretation, Question 11 only required an affirmative response if Plaintiff was diagnosed with alcoholism. *Id.*

In contrast, Defendant contends that Question 11 is not dependent on a diagnosis of alcoholism and is more reasonably read as a four-part question:

(1) Whether insured has "been diagnosed … for alcohol abuse?"

(2) Whether the insured has "been treated for alcohol … abuse?"

(3) Whether the insured has "been advised by a health care professional to discontinue the use of alcohol?"

(4) Whether the insured has "been advised by a health care professional … to seek treatment for … alcohol dependency?"

ECF No. 43-1 at 20. Thus, under Defendant's interpretation, advice to discontinue alcohol use need not have been for the purpose of addressing an alcohol-related illness and, by itself, required an affirmative response by Plaintiff.

The Court concludes that Defendant's proffered interpretation of Question 11 is the only reasonable interpretation of the question. The clause at issue is an independent clause; it asks whether the insured has "been advised by a health care professional to discontinue the use of"

alcohol. The clause is not dependent on any other part of the question related specifically to treatment or diagnosis of alcohol abuse. Thus, the question is not reasonably read as containing any implicit or explicit requirement that the advice to discontinue alcohol be given with or as a result of a diagnosis of alcoholism or as part of a treatment plan for alcohol abuse. Moreover, interpreting the question as asking only whether the insured had been advised to discontinue alcohol use in order to treat an alcohol-related illness would be partially redundant of subpart (2) of the question, which already asks whether the insured has been treated for alcohol abuse. Thus, the only reasonable reading of this part of the question is that it asks, in part, whether any medical provider has advised the insured to discontinue alcohol use, regardless of the primary purpose of that advice.

Given this interpretation of Question 11, the Court also finds that Mr. Martin's response of "no" was a material misrepresentation because the clear and convincing evidence shows that at least Dr. Muir advised Mr. Martin to discontinue alcohol use. *See Cohen*, 785 F.3d at 890 (stating that the insurer can demonstrate falsity as a matter of law by clear and convincing evidence). Dr. Muir's April 4, 2008 treatment plan included an instruction to "d/c" alcohol. ECF No. 43-14 at 3. Although at one point in his deposition Dr. Muir stated that "d/c" could either mean "discontinue" or "decrease," ECF No. 43-13 at 19, he stated that he followed the common practice of using "d/c" to refer to "discontinue" or "discharge" based on the context, that usually it means "discontinue," and that in the context of Mr. Martin's medical records, it "probably would read[,] and appropriately[,] discontinuation of alcohol." *See* ECF No. 43-13 at 10, 19, 36. Given that elsewhere in the notes for the same visit, Dr. Muir wrote out the word "decreased," *see* ECF No. 43-14 at 2, rather than using "d/c," it would be unreasonable for a jury to conclude that "d/c" alcohol meant anything other than "discontinue alcohol."

Even though, as Plaintiff points out, Dr. Muir had no memory of advising Mr. Martin to decrease his alcohol use at the time of his deposition, this is not evidence that Dr. Muir did not do so. There is also no other evidence in the record that conflicts with the instruction in Dr. Muir's treatment plan notes to discontinue alcohol use or suggests that it does not mean "discontinue alcohol."[5] Plaintiff's argument that Dr. Muir's notes do not necessarily reflect what was communicated to Mr. Martin is unpersuasive; it would be unreasonable for a jury to conclude that a doctor included an instruction in his summary of a treatment plan but then did not communicate that treatment plan to the patient. Thus, the clear and convincing evidence in the record demonstrates that Mr. Martin was advised to discontinue alcohol use by Dr. Muir on April 8, 2008, but he did not acknowledge that advice in the Application.

Plaintiff does not appear to dispute that this misrepresentation regarding advice to discontinue alcohol use is material. Indeed, Defendant provided uncontested testimony given under oath that it would have declined to issue the Policy had it known about this misrepresentation. *See* ECF No. 43-20 at 10 ("Well, had his true medical history [regarding alcohol use] been fully and accurately disclosed, we would have gotten records and then declined [the Policy]."); *see also Dominant Invs. 113, LLC v. U.S. Liab. Ins. Co.*, 247 F. Supp. 3d 696, 703 (D. Md. 2017) ("[A]n uncontested affidavit from an insurer's underwriting department that a policy would not have been issued if the insurer had known of the applicant's misrepresentation is 'adequate to find materiality as a matter of law.'"). Moreover, it is clear that Mr. Martin's misrepresentation regarding advice to discontinue alcohol use was material because Defendant

---

[5] Plaintiff refers to a signed sworn statement that Dr. Muir submitted prior to his deposition. In that statement, Dr. Muir attests that he "ha[d] no recollection of advising [Dr. Martin] to discontinue the use of alcohol, nor do [his] records indicate such advice by [him] to Mr. Martin." ECF No. 44-9. However, this statement only referenced records from the June 25, 2010 appointment and during his deposition, Dr. Muir testified that he only reviewed those particular records before signing the statement. ECF No. 43-13 at 34. Thus, the signed sworn statement is of little value to Plaintiff in creating a dispute about the "d/c" alcohol note in the April 4, 2008 record.

"was not able to appreciate the scope of the [health issues] it was being asked to insure." *See*

*Colony Ins. Co.*, 2018 WL 6018787, at *7. Accordingly, Defendant's Cross-Motion for

Summary Judgment can be granted, and Plaintiff's Cross-Motion for Summary Judgment denied,

on this basis alone.

The Court will briefly note that the evidence in the record does create genuine disputes of

material fact regarding the alleged advice Mr. Martin received from Mr. Thorn to discontinue

alcohol use and whether he was treated for alcohol abuse by any of his medical providers. With

respect to Mr. Thorn's advice, the evidence shows that Mr. Thorn advised Mr. Martin to

"continue to abstain from alcohol," and it would be for a jury to decide whether that constitutes

advice to discontinue alcohol use. With respect to treatment for alcohol abuse, Dr. Muir, Dr.

Thaker, and Mr. Thorn each provided testimony that they did not treat Mr. Martin for alcohol

abuse and that any discussion they had with Mr. Martin about alcohol was related to his anxiety.

ECF No. 44-9; ECF No. 43-13 at 36, 38; ECF No. 44-4 at 34, 131–32. On the other hand, there

is also evidence that Mr. Martin did drink excessively as a result of his anxiety and

communicated this to his doctors, who then incorporated that information into treatment plans,

and a reasonable juror could determine that a treatment plan that addressed both alcohol

dependency *and* anxiety could still constitute treatment for alcohol abuse. Thus, summary

judgment for Defendant based on Mr. Martin's response to Question 11 is limited to the April 4,

2008 advice he received from Dr. Muir to discontinue alcohol use.

### b. Recommendation for Liver Ultrasound

Mr. Martin's response to Question 8.b. on the Application provides a second basis for

granting Defendant's Motion for Summary Judgment. Question 8.b. asked, "Has any Insured,

within the past five years … been advised to have any diagnostic test, hospitalization or surgery

which was not completed?" ECF No. 43-5 at 4. Mr. Martin responded "No" to this question, *id.*, even though the undisputed evidence in the record shows that Dr. Muir wrote Mr. Martin a prescription for a liver ultrasound on June 30, 2010 because his liver enzymes were elevated. ECF No. 43-12; ECF No. 43-13 at 32. At his deposition, Dr. Muir testified that he would have explained to Mr. Martin that the liver ultrasound was necessary due to his elevated levels of liver enzymes. *Id.* at 33. There is no evidence in the record that Mr. Martin ever did the liver ultrasound, so the undisputed facts demonstrate that Mr. Martin's response of "no" to Question 8.b. was a misrepresentation because he was advised to have a diagnostic test—the ultrasound—and that test was not completed. At her deposition, Tammy Koenig, Defendant's corporate designee, explained that had Mr. Martin disclosed the prescription for the liver ultrasound, Defendant "would have requested medical records and denied the policy." ECF No. 43-20 at 26; *see Dominant Invs. 113, LLC*, 247 F. Supp. 3d at 703. Thus, Mr. Martin's misrepresentation was material and provided a valid basis for rescinding the Policy, and therefore summary judgment can also be granted to Defendant on this basis.

### c. Other Alleged Material Misrepresentations

There are disputed facts regarding Defendant's remaining proffered material misrepresentations, so they do not provide additional bases for granting Defendant's Cross-Motion for Summary Judgment. The Court will briefly address them.

Question 8.a. asked, "Has any Insured, within the past five years … had an electrocardiogram, X-ray or any other diagnostic test or procedure that was not previously disclosed?" ECF No. 43-5 at 4. Mr. Martin responded "No," *id.*, even though the uncontested evidence shows that he completed an electrocardiogram, hepatic function panel, and lipid panel within five years of the Application. *See* ECF No. 43-9 at 7; ECF No. 43-10 at 5. There is a

dispute, however, as to whether this misrepresentation was material. In support of its argument that the misrepresentation was material, Defendant cites only to a statement from Ms. Koenig's deposition demonstrating the materiality of *other* alleged misrepresentations.[6] In contrast, Plaintiff presents evidence that the electrocardiogram was "normal," ECF No. 43-13 at 7, that Defendant's internal underwriting guidelines typically throw out normal labs, ECF No. 43-20 at 12, and that hepatic function and lipid panels are routine tests, ECF No. 43-13 at 21; ECF No. 44-4 at 21. There is therefore no clear and convincing evidence that the misrepresentation regarding these diagnostic tests was material.

Question 5.d. asked, "Has any Insured ever consulted with a health care provider for … disorder of the … liver?" ECF No. 43-5 at 4. Mr. Martin responded "No," *id.*, which Defendant contends was a misrepresentation. The evidence shows that Mr. Martin completed hepatic function and lipid panels and had elevated or abnormal liver function tests, *see* ECF No. 43-11 at 3, but the record lacks any evidence of a liver disorder diagnosis or a discussion between Mr. Martin and his medical providers about a potential liver disorder. Dr. Thaker also testified that although she did not know if Mr. Thorn had consulted with Mr. Martin about any potential liver disorder, she would not have done so. ECF No. 44-4 at 21. Thus, whether Mr. Martin's response to Question 5.d. was a misrepresentation is a disputed fact.

Finally, Question 12 asked, "Has any Insured consulted a health care provider for any reason not previously disclosed?" ECF No. 43-5 at 4. Mr. Martin responded "Yes," and

---

[6] The cited portion of the deposition states that if Mr. Martin had disclosed the "test reflected here on page 305 [of Defendant's discovery materials]" or the liver ultrasound that he was prescribed, Defendant "would have requested medical records and denied the policy." ECF No. 43-20 at 26. The test reflected on page 305 of Defendant's discovery materials is a comprehensive metabolic panel ordered by Dr. Muir. ECF No. 43-9 at 10. Although the comprehensive metabolic panel appears to have been a part of a larger set of tests, including an electrocardiogram and lipid panel, Defendant's evidence of materiality does not pertain directly to those tests and therefore it does not clearly and convincingly demonstrate that Mr. Martin made material misrepresentations with respect to these diagnostic tests.

disclosed, among other consultations, that he had seen Dr. Muir. *Id.* at 8. In response to, "What was the reason?" he responded "[c]omplete physical," *id.*, and in response to, "What was the condition?" he responded "[n]ormal," *id.* Defendant contends that these responses were misrepresentations because Mr. Martin's physical with Dr. Muir on June 25, 2010 did not result in a normal finding; rather, Mr. Martin expressed a desire to decrease his alcohol consumption as a mechanism for managing his anxiety.

Viewing the questions regarding Mr. Martin's physical in context demonstrates that they were ambiguous. In response to the same question, Mr. Martin also disclosed doctors' visits for a dental exam and an enlistment physical. ECF No. 43-5 at 8. With respect to those two visits, the Application asked, "Was the result Normal?" ECF No. 43-5 at 8. Thus, the question "What was the condition?" with respect to the physical examination with Dr. Muir is notable and suggests the question was asking about something other than the result of the visit and was more reasonably asking why Mr. Martin consulted with Dr. Muir. Thus, there would be a triable issue of fact as to whether Mr. Martin's response of "normal" to the Application's question was indeed false.

Despite the disputed facts with respect to the electrocardiogram, hepatic function panel, lipid panel, consultation for liver disorder, and purpose of the physical examination by Dr. Muir, Defendant has demonstrated that the clear and convincing evidence in the record shows that Mr. Martin made material misrepresentations with respect to advice he received to discontinue alcohol use and a prescription he received to complete a liver ultrasound. It therefore properly rescinded the Policy and is entitled to summary judgment on Plaintiff's breach of contract claim.

Because Defendant properly rescinded the Policy, there was no valid contractual obligation and Plaintiff is therefore not entitled to summary judgment on her breach of contract claim.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's Cross-Motion for Summary Judgment is denied, and Defendant's Cross-Motion for Summary Judgment is granted. A separate Order shall issue.

Date: <u>February    27, 2020</u>                                 <u>    /s/                                          </u>
                                                                                                      GEORGE J. HAZEL
                                                                                                      United States District Judge